**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | 25 CR 318 |
| | ) | Judge Matthew Kennelly |
| v. | ) | |
| | ) | |
| SUFYAN FEROZE | ) | |
| | ) | |
| Defendant. | ) | |

**SUFYAN FEROZE'S MOTION TO SUPPRESS POST-ARREST STATEMENTS**

# TABLE OF CONTENTS

**I. Background** .......... 1

A. The Charges .......... 1

B. The Custodial Interrogation .......... 2

**II. Discussion** .......... 6

A. Mr. Feroze Unambiguously Invoked His Right to Counsel .......... 6

B. The Agents Did Not Honor Mr. Feroze's Invocation, and Mr. Feroze Did Not Reinitiate the Interrogation .......... 9

C. Mr. Feroze Did Not Knowingly, Intelligently, and Voluntarily Waive His Miranda Rights .......... 12

i. The Agents Left Mr. Feroze Misinformed About His Right to Counsel .......... 13

ii. The Agents Framed Waiver as the Price of Information About the Case .......... 14

iii. Mr. Feroze's Physical Condition, Inexperience, and the Conditions of Detention .......... 15

**III. Request for an Evidentiary Hearing** .......... 16

**IV. Conclusion** .......... 17

# TABLE OF AUTHORITIES

**Cases**


*Arizona v. Roberson*, 486 U.S. 675 (1988) .......... 7

*California v. Beheler*, 463 U.S. 1121 (1983) .......... 6

*California v. Prysock*, 453 U.S. 355 (1981) .......... 13

*Colorado v. Connelly*, 479 U.S. 157 (1986) .......... 12

*Davis v. United States*, 512 U.S. 452 (1994) .......... 7, 8

*Duckworth v. Eagan*, 492 U.S. 195 (1989) .......... 13, 14

*Edwards v. Arizona*, 451 U.S. 477 (1981) .......... *passim*

*Johnson v. Zerbst*, 304 U.S. 458 (1938) .......... 12

*Michigan v. Harvey*, 494 U.S. 344 (1990) .......... 7

*Minnick v. Mississippi*, 498 U.S. 146 (1990) .......... 7

*Miranda v. Arizona*, 384 U.S. 436 (1966) .......... 1, 6, 10, 13

*Moran v. Burbine*, 475 U.S. 412 (1986) .......... 12, 14

*North Carolina v. Butler*, 441 U.S. 369 (1979) .......... 12

*Oregon v. Bradshaw*, 462 U.S. 1039 (1983) .......... 11, 12

*Oregon v. Mathiason*, 429 U.S. 492 (1977) .......... 6

*Rhode Island v. Innis*, 446 U.S. 291 (1980) .......... 9

*Smith v. Illinois*, 469 U.S. 91 (1984) .......... 8, 10

*Thompson v. Keohane*, 516 U.S. 99 (1995) .......... 6

*United States v. Edgeworth*, 889 F.3d 350 (7th Cir. 2018) .......... 16

*United States v. Gallardo Flores*, 2014 WL 5391602 (N.D. Ill. 2014) .......... 9

*United States v. Hunter*, 708 F.3d 938 (7th Cir. 2013) .......... 7

*United States v. Lee*, 413 F.3d 622 (7th Cir. 2005)....7

*United States v. Martin*, 664 F.3d 684 (7th Cir. 2011)....9

*United States v. Robinson*, 586 F.3d 540 (7th Cir. 2009)....11, 12

*United States v. Rutledge*, 900 F.2d 1127 (7th Cir. 1990)....15

*United States v. Shabaz*, 579 F.3d 815 (7th Cir. 2009)....12, 15

*United States v. Stewart*, 536 F.3d 714 (7th Cir. 2008)....9, 12

*United States v. Wysinger*, 683 F.3d 784 (7th Cir. 2012)....14

*United States v. Yunis*, 859 F.2d 953 (D.C. Cir. 1988)....16

**Federal Rules**

Fed. R. Crim. P. 12(b)(3)(C)....1

**Statutes**

18 U.S.C. § 1347....1

18 U.S.C. § 1956....2

18 U.S.C. § 1957....2

18 U.S.C. § 3147....2

18 U.S.C. § 3501....1, 15

**Other Authority**

U.S. Const. amend. V....1

SUFYAN FEROZE'S MOTION TO SUPPRESS POST-ARREST STATEMENTS

Defendant, **Sufyan Feroze**, by and through his attorneys, Cheronis & Parente, pursuant to the Self-Incrimination and Due Process Clauses of the Fifth Amendment to the Constitution of the United States, Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3501, the principles enunciated in *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477, 484 (1981), as well as the other authority cited herein, respectfully moves this Court to suppress any and all statements he made during the course of his June 13, 2025 custodial interrogation at the Chicago Field Office of the Federal Bureau of Investigation after he invoked his right to counsel. In support of this motion, Mr. Feroze, through counsel, submits the following:

**I. Background**

**A. The Charges**

1. On June 13, 2025, agents of the Federal Bureau of Investigation (FBI) arrested Mr. Feroze at O'Hare International Airport on a warrant issued that day for a criminal complaint charging him with money laundering.[1] Mr. Feroze's brother, co-defendant Minhaj Feroz Muhammad, was arrested the same day on health care fraud charges.

2. On July 13, 2026, the Special April 2025 Grand Jury returned an eight-count Second Superseding Indictment. Dkt. # 125. Counts One through Six charge both defendants with health care fraud in violation of 18 U.S.C. § 1347. They allege that from approximately April 2023 through September 2025 the defendants used five COVID-19 testing laboratories (Clarity Testing Services,

[1] FBI Agents arrested Mr. Feroze as he was walking down the jetway to board an international flight to London, England where Mr. Feroze was scheduled to attend a wedding. Prior to boarding the flight, Mr. Feroze consumed approximately 40 milligrams of marijuana in order to aid his ability to sleep and relax on the international flight.

LLC; FZ Medical Group Inc.; SoCal Med Lab, Inc.; West Coast Medical Labs, Inc.; and Texas Clinical DX Inc.) to bill Medicare, Medicaid, and private insurers for testing that was not provided. *Id.* at ¶¶ 2–10. The indictment alleges approximately $293 million in fraudulent claims and approximately $65 million in payments. *Id.* at ¶ 9.

3. Count Seven charges both defendants with conspiracy to commit concealment money laundering in violation of 18 U.S.C. § 1956(h), together with a sentencing enhancement under 18 U.S.C. § 3147 for committing that offense while on pretrial release. It alleges, among other things, that the defendants diverted fraud proceeds to real estate developers in the United Arab Emirates and caused approximately $35 million in concealment transactions. *Id.*, Count Seven, ¶¶ 7, 15. Count Eight charges Mr. Feroze alone with engaging in a monetary transaction in criminally derived property in violation of 18 U.S.C. § 1957(a), based on a $20,000 withdrawal from an FZ Medical account on or about December 27, 2023. *Id.*, Count Eight, ¶ 2. The indictment also contains a forfeiture allegation.

4. The indictment specifically alleges that Mr. Feroze was an authorized signer on the bank accounts of Clarity, FZ Medical, and West Coast, *id.* at ¶ 1(y), and that he "made payments to third parties, including landlords, laboratory employees, and billers, so that the Labs appeared operational." *Id.* at ¶ 7.

**B. The Custodial Interrogation**

5. Following his arrest on June 13, 2025, Mr. Feroze was transported to the FBI's Chicago Field Office, where agents processed him, including by DNA swab and fingerprinting. FBI Special Agent Aaron Taylor, whom another agent described as "the lead on this," conducted the questioning. Special Agent Simon Mangiurea was present and took notes, occasionally asking for

clarification on certain points. A third agent, Special Agent James Stephens, appears later in the evening. The interview was audio and video recorded. The government has produced a recording of the interrogation (Exhibit A) and a transcript of that recording ("Gov't Tr."), attached as Exhibit B. This motion cites that transcript by page and timestamp.

6. Before any warnings were given, Mr. Feroze told the agents: "I'm starving. And I have to eat every couple hours. I'm a patient of gastric sleeve. So, my stomach the size of banana, so I can't eat a lot at the same time, but I have to eat every couple hours." Gov't Tr. 3 (00:04:27). SA Taylor responded that a meal would come "after we're done processing and, and stuff," and might be given "to the people at the jail to give to you." *Id.* (00:04:39). When Mr. Feroze asked, "who's going to tell us why, why we're being arrested?" *Id.* (00:05:02), SA Taylor showed him the arrest warrant on a complaint charging money laundering and said: "We do want to talk with you a little bit more about that, but that'll happen after the processing. You'll have an opportunity to talk more." Gov't Tr. 4 (00:05:09). Mr. Feroze said he was trying to "process everything," and asked whether he would be held until he was presented to a judge, which, "[c]onsidering it's a Friday," he assumed would not happen until Monday. Gov't Tr. 5 (00:09:06–00:09:42).

7. SA Taylor then introduced the FBI Advice of Rights form as follows:

| Time | Speaker | Statement |
|---|---|---|
| 00:09:50 | SA Taylor | All right, Sufyan. Um. So we talked a little bit about um why we're here. Showed you the warrant, um, the the charge that has been um issued. Um we want to talk a little bit more about that with you. Um before we can do that though, uh let me give you more information that that we have. We have to um do what's called this advice of rights form. I'll read it for you. Um, and then we can figure out if we want to talk more. Um, I can give you some information more after we do this. Otherwise, we can't really talk with you about the case. Like, we'll just be talking about processing stuff. Okay? |
| 00:10:38 | Feroze | All right. |

8. SA Taylor recorded the time as "approximately 8 o'clock p.m." and read the Advice of Rights form, attached as Exhibit C. Gov't Tr. 6 (00:10:39). The exchange that followed is the core of this motion:

| Time | Speaker | Statement |
|---|---|---|
| 00:11:47 | SA Taylor | Um all of that said, um do you do you understand what we, what we just read? |
| 00:11:54 | Feroze | I do. |
| 00:11:55 | SA Taylor | Okay. So, if you would like to speak with us, then, um you would need to sign here. Um that says, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." |
| 00:12:11 | Feroze | Okay. |
| 00:12:12 | SA Taylor | Um so, if you would like, you can make that signature. If you would like a lawyer present, just let us know. |
| 00:12:20 | Feroze | I'm going to involve my lawyer at some point, but we can talk right now.[2]<br>**(Mr. Feroze is speaking at this point while signing the Advice of Rights Form. See Ex A at 00:12:20)** |
| 00:12:25 | SA Taylor | Well, so so this. You you want to invoke right now? |
| 00:12:30 | Feroze | Yeah, I mean I'm definitely going to need an attorney. I've never been through the process. I don't know how it goes. I definitely need some legal representation here. |
| 00:12:38 | SA Taylor | Okay. So so right now, that that's that's an invocation. |
| 00:12:31 [sic] | Feroze | Okay. |
| 00:12:42 | SA Taylor | Um so you don't want to talk with us about your case. |
| 00:12:46 | Feroze | So, either I no, I I want to talk to you about the case, but I also want a lawyer. I mean, I'm not going to get a lawyer right now, but at least I I want to understand what's going on |
| 00:12:57 | SA Taylor | Right. |
| 00:12:57 | Feroze | And if I need a lawyer, I'm I'm still able to retain a lawyer. Yes or no? |
| 00:13:00 | SA Taylor | Ok. So, so yes. So, here here's how this works. Uh you can talk with us as long as you want. The moment you invoke and say you want a lawyer, we stop talking. We can't talk. So, yeah, you're good to go. If |

[2] Mr. Feroze had previously retained counsel regarding the subject matter of this interrogation on December 13, 2023.

| Time | Speaker | Statement |
|---|---|---|
| | | you want to talk with us, you can talk with us as long as you want. And the moment you want to stop, just say you want your lawyer. Okay? |
| 00:13:17 | Feroze | Okay. All right |
| 00:13:18 | SA Taylor | Okay. Great. Um I'm going to sign here as a witness. |

9. While the agents were completing the form, Mr. Feroze asked: "I don't know if you can say this. Why is why is my brother being arrested?" Gov't Tr. 7 (00:13:37). SA Taylor answered, first stating that his brother had been arrested on money laundering charges and then correcting himself to say health care fraud. *Id.* (00:13:41–00:13:52). SA Taylor then asked SA Mangiurea for "that paper that I gave you with the questions," which an agent retrieved from a car. Gov't Tr. 8 (00:14:53–00:15:17). On returning, SA Taylor began the substantive interrogation: "Alright, Sufyan, thanks for waiting. Okay. Um, first off, um, where do you currently work?" *Id.* (00:16:15).

10. Over the next twenty-five minutes, the agents questioned Mr. Feroze about his work for FZ Medical, Clarity, and West Coast Medical; his status as an authorized user on bank accounts; his payments to employees, billers, rent, and utilities; his deposit of a $1.5 million check; his relationship with a person helping him and his brother "get into real estate in Dubai"; transfers to "a company in Dubai"; and his compensation. Gov't Tr. 8–27 (00:16:15–00:41:07); *see, e.g.*, Gov't Tr. 10 (00:18:33), 14 (00:22:24), 17 (00:26:42), 22 (00:33:52), 25 (00:37:33). When SA Taylor asked whether there was anything suspicious he should know about, Mr. Feroze said he "kind of knew there was something fishy going on," and added: "I knew something was fishy but that's all I want you to know." Gov't Tr. 24 (00:35:57). SA Taylor pressed on: "Why why did you think something was fishy?" *Id.* (00:36:15). He then told Mr. Feroze: "Now is your chance to tell your side of the story. Now is your chance to take control of your narrative, *id.* (00:37:14), and "this is your opportunity." Gov't Tr. 25 (00:37:22).

11. After the questioning ended, SA Mangiurea asked Mr. Feroze whether he wanted to use the bathroom, remarking: "It's been like 5 hours." Gov't Tr. 28 (00:44:34). Mr. Feroze then said he thought his blood sugar was "going down," Gov't Tr. 29 (00:46:24); explained that after his gastric surgery he had developed ulcers and needed "pantoprazole" and "Tums," Gov't Tr. 30 (00:46:55); and repeated that he has "to eat every 2 hours." *Id.* (00:47:51). SA Stephens gave him glucose. Gov't Tr. 31 (00:48:07–00:48:10). The recording reflects food being mentioned again only as Mr. Feroze was being re-handcuffed and escorted out. Gov't Tr. 35–36 (00:55:14–00:57:12).

12. The government may seek to introduce statements made by Mr. Feroze during this custodial interrogation in its case-in-chief at trial, including statements bearing directly on the allegations in paragraphs 1 and 7 of Counts One through Six and paragraph 7 of Count Seven.

## II. Discussion

### A. Mr. Feroze Unambiguously Invoked His Right to Counsel.

13. The government may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A person is in custody when he is under formal arrest or his freedom of movement is restrained to a comparable degree. *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)); *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Mr. Feroze was under formal arrest on a warrant, handcuffed, and being processed at an FBI field office when he was questioned. *Miranda* clearly applied.

14. Once an accused asks for an attorney, questioning must stop until counsel is present, unless he himself reopens communication with the police. *Miranda*, 384 U.S. at 474; *Edwards v.*

*Arizona*, 451 U.S. 477, 484–85 (1981); *see also Minnick v. Mississippi*, 498 U.S. 146, 153 (1990). The rule is meant to keep police from pressuring a suspect into giving up *Miranda* rights he has already asserted, *Michigan v. Harvey*, 494 U.S. 344, 350 (1990), and to give law enforcement clear and unambiguous guidance. *Arizona v. Roberson*, 486 U.S. 675, 682 (1988).

15. Whether a suspect has invoked the right is an objective inquiry: he must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). A statement expressing a certain, present desire to consult counsel is enough to invoke the right. *United States v. Hunter*, 708 F.3d 938, 943 (7th Cir. 2013); *see also United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005). When the request is unambiguous, application of the *Edwards* rule is both "rigid" and "objective." *Davis*, 512 U.S. at 458.

16. Mr. Feroze's invocation satisfies that standard. SA Taylor asked him a direct, yes-or-no question about a present invocation: "You you want to invoke right now?" Mr. Feroze answered: "Yeah, I mean I'm definitely going to need an attorney. ... I definitely need some legal representation here." Gov't Tr. 6 (00:12:25–00:12:30). That is an affirmative answer to a question about invoking *now*, followed by an emphatic, twice-repeated statement of need for counsel. It bears no resemblance to the equivocal musing found insufficient in *Davis* ("Maybe I should talk to a lawyer"). 512 U.S. at 462.

17. The Court need not speculate about how a reasonable officer would have understood Mr. Feroze's words, because the officer in the room said so on the record: "So so right now, that that's that's an invocation." Gov't Tr. 6 (00:12:38). After which, tellingly, Mr. Feroze responded, "Okay," *id.*, and SA Taylor then stated the consequence himself: "Um so you don't want to talk with

us about your case." Gov't Tr. 7 (00:12:42). The agent's characterization is not legally dispositive. But where the questioning officer recognized and announced the invocation, the suspect agreed, and the officer summarized it as a decision not to talk, it cannot seriously be maintained that a reasonable officer would have failed to understand it as one.

18. The government will point to Mr. Feroze's earlier remark: "I'm going to involve my lawyer at some point, but we can talk right now." Gov't Tr. 6 (00:12:20). That remark does not defeat the invocation; it is the reason SA Taylor asked the clarifying question. *Davis* endorses precisely that practice—asking a clarifying question when a statement is unclear. 512 U.S. at 461. Here the agent did so, and Mr. Feroze's answer resolved any uncertainty in favor of invocation. Nothing about the circumstances leading up to the request renders the request itself ambiguous. *See Smith v. Illinois*, 469 U.S. 91, 98 (1984).

19. Nor may Mr. Feroze's statements after the invocation be used to cloud it. "[A]n accused's post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Smith*, 469 U.S. at 100. Thus Mr. Feroze's response at 00:12:46 is legally irrelevant to whether he invoked at 00:12:30. In any event, that response reaffirmed the invocation ("I also want a lawyer"). His further comment, "I'm not going to get a lawyer right now," Gov't Tr. 7 (00:12:46), did not withdraw the request; it reflected his mistaken belief that a lawyer was not available to him that evening—a belief the agents never corrected. *See* Section II.C, *infra*.[3]

[3] This was not a declarative statement by Mr. Feroze, rather, as is clear from the recording and its context, he was speaking his understanding, based on the circumstances, that he *could not* get a lawyer at that moment.

20. Mr. Feroze therefore unambiguously invoked his right to counsel at 00:12:30, and the bright-line rule of *Edwards* applied from that moment forward. Agent Taylor was required to stop all further interrogation of Mr. Feroze.

**B. The Agents Did Not Honor Mr. Feroze's Invocation, and Mr. Feroze Did Not Reinitiate the Interrogation.**

21. The *Edwards* rule flatly bars further interrogation once an accused invokes his right to counsel. *United States v. Martin*, 664 F.3d 684, 688 (7th Cir. 2011). The only exceptions are where counsel is provided or where the accused himself "initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485. Interrogation includes not only express questioning but also police words or actions that officers should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The government bears the burden of proving by a preponderance of the evidence that the defendant reinitiated. *United States v. Gallardo Flores*, 2014 WL 5391602, *4 (N.D. Ill. 2014) (St. Eve, J.) (citing *Edwards*, 451 U.S. at 484); *see also United States v. Stewart*, 536 F.3d 714, 719 (7th Cir. 2008).

22. Here, Mr. Feroze signed the document while talking about retaining an attorney. In response, SA Taylor asked, “You you want to invoke right now?” Mr. Feroze responded, “[y]eah, I mean I'm definitely going to need an attorney. I've never been through the process. I don't know how it goes. I definitely need some legal representation here.” SA Taylor then stated, “that’s an invocation.”

23. The agents did not stop. Immediately after acknowledging the invocation, SA Taylor said: "Um so you don't want to talk with us about your case." Gov't Tr. 7 (00:12:42). Rather than ending the interview, he left that statement hanging as an invitation for Mr. Feroze to back away from the request he had just made. When Mr. Feroze responded by asking whether he could still

have a lawyer, SA Taylor did not honor the request already made. Instead, he recast invocation as something that had not yet happened: "Uh you can talk with us as long as you want. The moment you invoke and say you want a lawyer, we stop talking. We can't talk. So, yeah, you're good to go." *Id.* (00:13:00). But Mr. Feroze had already invoked and had already said he wanted a lawyer—twice.

24. That sequence is the police-initiated effort to secure a waiver after invocation that *Edwards* forbids. A valid waiver "cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484. The interrogator may not proceed on his own terms, as if no request had been made, in the hope that the suspect might be induced to say something casting doubt on that request. *See Smith*, 469 U.S. at 98–99. That is what happened here.

25. The result is the same even though Mr. Feroze signed the Advice of Rights form before he invoked. The form itself told him he could stop answering "at any time," Ex. C, and an invocation after a waiver requires questioning to cease. *Miranda*, 384 U.S. at 473–74. SA Taylor described the rule the same way: "The moment you invoke and say you want a lawyer, we stop talking." Gov't Tr. 7 (00:13:00). Mr. Feroze had already done so, yet the agent kept talking.

26. Moreover, Mr. Feroze did not reinitiate when, as the agents were completing the form, he asked: "I don't know if you can say this. Why is why is my brother being arrested?" Gov't Tr. 7 (00:13:37). The argument fails for two independent reasons.

27. First, a suspect cannot "initiate" a conversation that the police have already reopened. By 00:13:37 the agents had already re-solicited Mr. Feroze's willingness to talk, told him he was "good to go," and executed the waiver form. The *Edwards* inquiry asks who initiated further communication

after the invocation, and on this record the answer is the agents. Mr. Feroze's question came in the middle of an interrogation process the agents had already restarted.

28. Second, the question was not the kind of statement that initiates under *Edwards*. A suspect reinitiates only by a statement that "evince[s] a willingness and a desire for a generalized discussion about the investigation." *United States v. Robinson*, 586 F.3d 540, 545 (7th Cir. 2009) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983). "[I]nquiries or statements . . . relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation." *Bradshaw*, 462 U.S. at 1045. Mr. Feroze's question, which he prefaced with "I don't know if you can say this," concerned why his brother, arrested alongside him that day, was in custody. It fits a consistent pattern of questions about the circumstances of the arrests: why he was being arrested, Gov't Tr. 3 (00:05:02); whether he would be held until he saw a judge, Gov't Tr. 5 (00:09:30); when the warrant was issued, Gov't Tr. 31 (00:48:43); whether his brother, who "was sick since last night," was still there, Gov't Tr. 32 (00:50:15); and whether he could call his family, *id.* (00:51:37). SA Taylor answered in two sentences. Then, after an agent retrieved "that paper that I gave you with the questions" from a car, SA Taylor opened the substantive interrogation with a question unrelated to Mr. Feroze's brother: "first off, um, where do you currently work?" Gov't Tr. 8 (00:14:53–00:16:15). The prepared list of questions confirms that the interrogation was the agents' plan from the outset, not a response to anything Mr. Feroze asked.

29. Because Mr. Feroze invoked his right to counsel and the agents, not Mr. Feroze, initiated the interrogation that followed, all statements made after 00:12:30 must be suppressed. And even if the Court were to find that Mr. Feroze reinitiated, that finding would not end the inquiry. Initiating a conversation does not, standing alone, necessarily waive the right to counsel.

*Robinson*, 586 F.3d at 545; *see Bradshaw*, 462 U.S. at 1044–46. The government must still prove a knowing, intelligent, and voluntary waiver, which it cannot do.

**C. Mr. Feroze Did Not Knowingly, Intelligently, and Voluntarily Waive His *Miranda* Rights.**

30. Where the government seeks to use statements obtained through custodial interrogation, it must show not only that the accused was given and understood his *Miranda* rights, but that he waived them knowingly, intelligently, and voluntarily. *See Edwards*, 451 U.S. at 482. The government bears that burden by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *Stewart*, 536 F.3d at 719. A waiver is "an intentional relinquishment or abandonment of a known right or privilege," and "courts indulge every reasonable presumption against waiver." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The government will rely on Mr. Feroze's signature on the consent portion of the Advice of Rights form. An express written waiver is usually strong evidence of a valid waiver, but it is neither always necessary nor always sufficient. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

31. The inquiry has two dimensions. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Relevant considerations include the defendant's background and conduct, the length and conditions of the interview and detention, the defendant's physical and mental condition, the officers' attitude, and whether they used coercive techniques. *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009).

**i. The Agents Left Mr. Feroze Misinformed About His Right to Counsel.**

32. Any ostensible waiver was not "knowing" or "intelligent" because Mr. Feroze did not understand that he could have a lawyer that night, and the agents' answer to his direct question reinforced that misunderstanding. The written form, and SA Taylor's reading of it, stated the rights correctly. Ex. A; Gov't Tr. 6 (00:10:39). But Mr. Feroze's words after hearing and seeing those warnings show that he did not understand them. He told the agents, "I'm not going to get a lawyer right now," and then asked: "And if I need a lawyer, I'm I'm still able to retain a lawyer. Yes or no?" Gov't Tr. 7 (00:12:46–00:12:57). The accurate answer was that he was entitled to have a lawyer before and during any questioning, that one would be appointed free of charge if he could not afford one, and that because he had asked for a lawyer, questioning had to stop until one was present. *Miranda*, 384 U.S. at 470, 474.

33. SA Taylor gave none of that information, and his answer muddied the warnings rather than clarifying them. He did not correct Mr. Feroze's stated belief that he could not get a lawyer "right now." Instead, he redefined the right to counsel as nothing more than a right to stop talking at some future moment: "Uh you can talk with us as long as you want. ... And the moment you want to stop, just say you want your lawyer." Gov't Tr. 7 (00:13:00). Under that description, a lawyer was something that would come later, after the interview ended, rather than a resource available before and during questioning.

34. The Supreme Court has distinguished adequate warnings from those in which "the reference to the right to appointed counsel was linked [to] a future point in time after the police interrogation." *California v. Prysock*, 453 U.S. 355, 360 (1981); *cf. Duckworth v. Eagan*, 492 U.S. 195, 204 (1989). And the Seventh Circuit has held that a statement must be suppressed where the agents'

remarks, made in response to a suspect's questions about counsel, left him misinformed about his right to counsel before and during questioning. *United States v. Wysinger*, 683 F.3d 784, 795–96 (7th Cir. 2012). Correct written warnings do not cure an officer's later misleading answer to a suspect's direct question about counsel. The inquiry is whether the suspect was reasonably informed of his rights in light of everything he was told. *See Duckworth*, 492 U.S. at 203. Mr. Feroze said in terms that he believed a lawyer was not available to him "right now," asked a direct question about it, and received an answer that left that belief intact. A waiver resting on that misunderstanding is not made "with a full awareness of . . . the nature of the right being abandoned." *Moran*, 475 U.S. at 421.

**ii. The Agents Framed Waiver as the Price of Information About the Case.**

35. The waiver was also not the product of "a free and deliberate choice." *Moran*, 475 U.S. at 421. Before any warnings were given, SA Taylor told Mr. Feroze that a conversation was coming: "We do want to talk with you a little bit more about that, but that'll happen after the processing. You'll have an opportunity to talk more." Gov't Tr. 4 (00:05:09). When SA Taylor introduced the rights form, he presented it as the gateway to information about the case: "I'll read it for you. Um, and then we can figure out if we want to talk more. Um, I can give you some information more after we do this. Otherwise, we can't really talk with you about the case. Like, we'll just be talking about processing stuff." Gov't Tr. 5 (00:09:50).

36. That framing worked as designed. Mr. Feroze had just been arrested, said he was trying to "process everything," Gov't Tr. 5 (00:09:06), and knew his brother had been arrested the same day. He explained that "at least I I want to understand what's going on." Gov't Tr. 7 (00:12:46). SA Taylor had told him the only way to learn about the case was to sign the form. Mr. Feroze's willingness to talk was thus an effort to learn about the charges against him, not an informed

decision to give up the lawyer he had just requested. Apart from two sentences about his brother's charge, the agents never delivered the promised information; they worked through a prepared list of questions instead. Gov't Tr. 8–27.

37. Law enforcement may engage in some degree of persuasion and even deception during interrogation, but only within constitutional limits. *See United States v. Rutledge*, 900 F.2d 1127, 1130–31 (7th Cir. 1990); 18 U.S.C. § 3501(b). Conditioning information about the charges on waiver, after the suspect has asked for a lawyer and while leaving him misinformed about his right to one, exceeds those limits.

**iii. Mr. Feroze's Physical Condition, Inexperience, and the Conditions of Detention.**

38. Mr. Feroze's personal circumstances further undermine any claim of a knowing and voluntary waiver. Before the warnings, he told the agents that he was "starving," that he is "a patient of gastric sleeve," and that he has "to eat every couple hours." Gov't Tr. 3 (00:04:27). SA Taylor told him a meal would come only "after we're done processing and, and stuff." *Id.* (00:04:39). The interrogation began at approximately 8:00 p.m. Gov't Tr. 6 (00:10:39). When an agent finally offered Mr. Feroze the bathroom after questioning ended, the agent remarked, "It's been like 5 hours." Gov't Tr. 28 (00:44:34). Minutes later Mr. Feroze reported that his blood sugar was "going down," Gov't Tr. 29 (00:46:24); explained that he had developed ulcers after his surgery and needed "pantoprazole" and "Tums," Gov't Tr. 30 (00:46:55); and was given glucose. Gov't Tr. 31 (00:48:07–00:48:10). These facts bear directly on Mr. Feroze's physical condition and on the duration and conditions of his interview and detention. *See Shabaz*, 579 F.3d at 820.

39. Mr. Feroze also had never been subject to a custodial interrogation before. As he told the agents when he invoked: "I've never been through the process. I don't know how it goes." Gov't

Tr. 6 (00:12:30). His only prior contact with the FBI, which he volunteered, was a visit to his home roughly a year and a half earlier about a complaint, after which he was told "everything was okay." Gov't Tr. 8 (00:14:38–00:14:46). That is not experience with custodial interrogation. His education, experience, and conduct, *United States v. Yunis*, 859 F.2d 953, 965 (D.C. Cir. 1988), including his professed unfamiliarity with the process and his repeated questions about what would happen next, made it all the more important that the agents answer his questions about counsel accurately. They did not.

40. Considering the totality of the circumstances—an invocation the agents acknowledged and then talked past, a direct question about counsel answered in a way that left Mr. Feroze misinformed, a pre-warning framing that made waiver the price of information, and a hungry, medically compromised arrestee with no experience of the process—the government cannot carry its burden of proving a knowing, intelligent, and voluntary waiver.

**III. Request for an Evidentiary Hearing**

41. An evidentiary hearing is required when the defendant presents a substantial claim and disputed issues of material fact will affect the outcome of the motion. *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018). This motion presents a substantial claim supported by specific, timestamped facts drawn from the government's own recording.

42. A hearing may not be necessary as the video and transcript evince a clear invocation and violation of the *Edwards* rule. Should the matter proceed past that point, into the realm of valid waiver, the government may dispute the factual narrative set out above, or the inferences to be drawn from it.

## IV. Conclusion

43. Based on the foregoing, Mr. Feroze, through counsel, respectfully requests that the Court suppress, in this and any other criminal proceeding, any and all statements he made during his June 13, 2025 custodial interrogation after invoking his right to counsel at approximately 00:12:30 on the recording, or grant an evidentiary hearing, or other such further relief as the Court deems just.

Respectfully Submitted,

s/ Damon M. Cheronis
**Damon M. Cheronis**

s/ Christopher V. Parente
**Christopher V. Parente**

**Cheronis & Parente LLC**
140 S. Dearborn Street, Suite 404
Chicago, IL 60603
(312) 663-4644
damon@cheronislaw.com